UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

EUGENE BEARDEN,

                Petitioner,

v.

CATHERINE BAUMAN,

                Respondent.

_____/

Case No. 2:23-cv-69

Honorable Hala Y. Jarbou

## **OPINION**

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Eugene Bearden is incarcerated with the Michigan Department of Corrections at the Alger Correctional Facility (LMF) in Munising, Alger County, Michigan. On December 3, 2019, following a two-day jury trial in the Oakland County Circuit Court, Petitioner was convicted of two counts of armed robbery, in violation of Mich. Comp. Laws § 750.529. On January 8, 2020, the court sentenced Petitioner as a fourth habitual offender, Mich. Comp. Laws § 769.12, to concurrent prison terms of 47 to 97 years.

On April 6, 2023, Petitioner filed his habeas corpus petition raising four grounds for relief, as follows:

    I.      Ineffective assistance of counsel . . . The witnesses made multiple statements, and were allowed to ID me in court. Also my attorney did not do any pre-trial investigation or preparation to properly cross-examine a witness who had made conflicting statements. Also he did not put any evidence on the record that was given to help me.

    II.     Prosecutor misconduct, intentionally eliciting false testimony for allowing an on-site and courtroom identification. . . . Misidentification[;] Both of the witnesses stated that they were robbed by someone else then switched

the[ir] statements in court. Also he knew the truth and allowed lies to taint the ears of the jury.

III.     Violation of due process to a fair trial, false testimony. . . . The prosecutor failed to correct th[ei]r false testimony and repeatedly misrepresented the record.

IV.     Trial lawyer failed to get expert identification[;] he also failed to use evidence that help[ed] my case. . . . There were statements made that after I had an expert look at them would have been able to testify that what was being said is not ac[curate] plus in the interview of the victim she says I am not the guy in the picture on [F]acebook.

(Pet., ECF No. 1, PageID.5, 7–8, 10.) Respondent contends that Petitioner's grounds for relief are meritless.[1] (ECF No. 9.) For the following reasons, the Court concludes that Petitioner has failed to set forth a meritorious federal ground for habeas relief and will, therefore, deny his petition for writ of habeas corpus.

## Discussion

### I.     Factual Allegations

The Michigan Court of Appeals described the facts underlying Petitioner's convictions as follows:

This case arises out of an armed robbery that occurred on January 23, 2019, in the city of Pontiac, Michigan. On that date, Aline Barker and Dylan Williams arranged to purchase a vehicle from a seller for $1,700. Barker and Williams negotiated with

---

[1] Respondent also contends that habeas ground II is unexhausted, and that habeas ground III is procedurally defaulted. (ECF No. 9, PageID.67–68.) Respondent does recognize, however, that a habeas corpus petition "may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." *See* 28 U.S.C. § 2254(b)(2). Furthermore, the Supreme Court has held that federal courts are not required to address a procedural default issue before deciding against the petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."); *see also Overton v. Macauley*, 822 F. App'x 341, 345 (6th Cir. 2020) ("Although procedural default often appears as a preliminary question, we may decide the merits first."); *Hudson v. Jones*, 351 F.3d 212, 215–16 (6th Cir. 2003) (citing *Lambrix*, 520 U.S. at 525; *Nobles v. Johnson*, 127 F.3d 409, 423–24 (5th Cir. 1997); 28 U.S.C. § 2254(b)(2)). Here, rather than conduct a lengthy inquiry into exhaustion and procedural default, judicial economy favors proceeding directly to a discussion of the merits of Petitioner's claims.

the seller through Facebook and agreed to purchase the vehicle at the seller's home. The seller's Facebook profile name was Geno Beatden.

When Barker and Williams arrived at the seller's home with their two-year-old son, the seller invited them inside. Barker and Williams recognized the seller from the picture associated with Geno Beatden's Facebook profile and agreed to enter the seller's home. Upon entering the home, Barker and Williams noticed that there were two other men inside. Barker and Williams spoke with the seller for approximately 20 minutes. At some point, the seller left the room. Shortly thereafter, two men emerged from the basement of the home with masks on. The men were holding firearms and demanded that Barker and Williams turn over their belongings. Barker and Williams gave the individuals approximately $1,700 in cash, a cell phone, a cell phone charger, a tablet, and a debit card from H & R Block. After the robbery, Barker and Williams were able to exit the home, and Barker was able to call the police using a passerby's cell phone.

When the police arrived, Williams informed them that the seller was wearing a multicolored bandana on his head. [Petitioner] lived next door to the home where the robbery occurred, and the police knocked on his door to investigate. [Petitioner] answered the door wearing only boxer shorts, a multicolored bandana, and socks. [Petitioner] allowed the police to search his home. The police found two other individuals inside, Argina Colman and Derrion Spivey. The police also found a cell phone charger, a tablet, a debit card from H & R Block, and $1,662 in cash. The police placed [Petitioner] in custody and allowed him to put clothes on. The police escorted [Petitioner] outside at which point Barker and Williams both identified [Petitioner] as one of the individuals involved in the robbery. Barker and Williams stated that [Petitioner] was the individual whom they previously believed to be Geno Beatden.

*People v. Bearden*, No. 352303, 2021 WL 2494007, at *1 (Mich. Ct. App. June 17, 2021).

Prior to trial, Petitioner, through counsel, moved for suppression of the victims' out-of-court identification of him as one of the individuals involved in the robbery. The trial court held an evidentiary hearing with respect to that issue on October 15, 2019. (Mot. Hr'g Tr., ECF No. 10-7.) At the conclusion of the hearing, the trial court denied Petitioner's motion, finding that Petitioner had not met his burden of showing that the identification in question was "unduly suggestive." (*Id.*, PageID.265.)

Jury selection for Petitioner's trial occurred on December 2, 2019. (Trial Tr. I, ECF No. 10-8.) Over the course of two days, the jury heard testimony from Barker, Williams, several law

enforcement officers, and Petitioner himself. (Trial Tr. I & II, ECF Nos. 10-8, 10-9.) On December 3, 2019, after a little over three hours of deliberation, the jury reached a guilty verdict. (Trial Tr. II, ECF No. 10-9, PageID.697.) Petitioner appeared before the trial court for sentencing on January 8, 2020. (ECF No. 10-10.)

Petitioner, with the assistance of appellate counsel, appealed his convictions and sentence to the Michigan Court of Appeals, raising the following claims for relief: (1) the trial court erred in denying Petitioner's motion to suppress the victims' identifications of Petitioner; (2) the prosecutor committed misconduct by eliciting false testimony from Barker, Williams, and Oakland County Sheriff's Sergeant Kevin Braddock; (3) the prosecutor committed misconduct by mischaracterizing statements Petitioner made during jail calls made to his girlfriend; (4) the prosecutor committed misconduct by mischaracterizing Petitioner's testimony regarding his prior crimes and guilty pleas thereto; and (5) counsel rendered ineffective assistance in various ways. *Bearden*, 2021 WL 2494007, at *2–14. The court of appeals affirmed Petitioner's convictions and sentences on June 17, 202. *Id.* at *1. The Michigan Supreme Court denied Petitioner's application for leave to appeal on May 27, 2022. *See People v. Bearden*, 974 N.W.2d 189 (Mich. 2022). This § 2254 petition followed.

## II.    AEDPA Standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an

4

unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and

5

comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotation marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the

underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721. Then, the petitioner's claim is reviewed *de novo*. *Id*. (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

## III.   Discussion

### A.     Grounds II and III—Prosecutorial Misconduct

In habeas grounds II and III, Petitioner raises claims of prosecutorial misconduct. First, in habeas ground II, Petitioner contends that the prosecutor elicited false testimony from the victims concerning their identifications of Petitioner. (Pet., ECF No. 1, PageID.7.) Petitioner argues that this testimony was false because the victims "stated that they were robbed by someone else then switched th[ei]r statements in court." (*Id.*) Petitioner avers that the prosecutor "knew the truth and allowed lies to taint the ears of the jury." (*Id.*) In habeas ground III, Petitioner asserts that the prosecutor violated his due process rights by "fail[ing] to correct th[ei]r false testimony and repeatedly misrepresent[ing] the record." (*Id.*, PageID.8.)

For a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In evaluating the impact of the prosecutor's misconduct, a court should consider the extent to which the claimed misconduct

7

tended to mislead the jury or prejudice the petitioner. *See United States v. Young*, 470 U.S. 1, 11–12 (1985). The Supreme Court has described the *Darden* standard as "a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations.'" *Parker v. Matthews*, 567 U.S. 37, 48 (2012). The *Parker* Court rejected an attempt to graft any additional requirements on the "very general" *Darden* standard.

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). Indeed, "[t]he Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (quoting *Donnelly*, 416 U.S. 637, 645). Thus, in order to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker*, 567 U.S. at 47 (internal quotation marks omitted).

### 1.    False Testimony

The Fourteenth Amendment's right to due process prohibits a state from knowingly and deliberately using perjured evidence to obtain a conviction. *See Napue v. Illinois*, 360 U.S. 264, 260 (1959). The Supreme Court has recognized that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio v. United States*, 405 U.S. 150, 153 (1972) (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)). Presentation of perjured testimony, without more, however, does not rise to the level of a constitutional violation. *See Briscoe v. LaHue*, 460 U.S. 325, 327 (1983). Rather,

> [t]he knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. In order to establish prosecutorial misconduct or denial of due process, the defendants must show (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false. The burden is on the defendants to show that the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony.

*United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989) (citations omitted).

Petitioner raised his argument concerning the victims' identifications of him on direct appeal, and the court of appeals rejected it, stating:

> The test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial. *People v. Dobek*, 274 Mich. App. 58, 63; 732 N.W.2d 546 (2007). It is well settled that a conviction obtained through the knowing use of false testimony violates a defendant's due process protections guaranteed by the Fourteenth Amendment. *People v. Aceval*, 282 Mich. App. 379, 389; 764 N.W.2d 285 (2009). However, a prosecutor may call a witness who provides testimony that is inconsistent with their prior statements as long as the prosecutor does not conceal the inconsistencies and has not kept the contents of the prior statements from the defense. *People v. Parker*, 230 Mich. App. 677, 690; 584 N.W.2d 753 (1998). It is for the jury to decide whether a witness's testimony is credible in the face of conflicting testimony. *People v. Canter*, 197 Mich. App. 550, 565; 496 N.W.2d 336 (1992). In the instant matter, there is no evidence that the prosecutor attempted to conceal the inconsistencies in the witnesses' prior statements or attempted to keep the contents of the prior statements from the defense. Indeed, defense counsel was afforded ample opportunity to impeach the witnesses' credibility at trial. Accordingly, the prosecutor did not engage in prosecutorial misconduct by eliciting testimony from Barker, Williams, and Sergeant Braddock that may have been inconsistent with their prior statements.

*Bearden*, 2021 WL 2494007, at *5.

Petitioner offers nothing to suggest that the court of appeals' analysis is contrary to, or an unreasonable application of, clearly established federal law. Petitioner fails to establish that the testimony offered by Barker and Williams at trial, particularly their in-court testimony identifying Petitioner as one of the individuals involved in the robbery, was false. Simply pointing out the inconsistencies between the victims' statements regarding identification of the perpetrators does not suffice to show perjury. *See Lochmondy*, 890 F.2d at 822. Notably, Petitioner offers nothing

from which this Court could conclude that the prosecutor knowingly offered perjured testimony. Moreover, the court of appeals correctly noted that defense counsel impeached the victims' credibility with the prior statements they had made to law enforcement. (Trial Tr. I, ECF No. 10-8, PageID.413–425, 433–437, 485–497.) Furthermore, during cross-examination of Sergeant Braddock, defense counsel had Braddock admit that when he interviewed Barker, Barker told him that "the two men who robbed her were different than Mr. Bearden." (*Id.*, PageID.518.)

Where Petitioner has not shown that the statements were false or that the prosecutor knew they were false, he is not entitled to relief with respect to this assertion of prosecutorial misconduct.

## 2.   Misrepresentation of the Record

Petitioner also vaguely asserts that the prosecutor committed misconduct by "repeatedly misrepresent[ing] the record." (Pet., ECF No. 1, PageID.8.) Petitioner, however, provides no support for this assertion. On direct appeal, Petitioner argued that the prosecutor mischaracterized Petitioner's statements during calls he made from jail to his girlfriend, as well as Petitioner's testimony concerning his past crimes and guilty pleas thereto. *See Bearden*, 2021 WL 2494007, at *6–7. The Court, therefore, presumes that these are the alleged misrepresentations that Petitioner refers to in his § 2254 petition.

During opening statements, the prosecutor made the following reference to the jail calls:

Now, ladies and gentlemen, you're also going to hear and find out that phone calls at the county jail are recorded and subject to monitoring, and the [Petitioner], as soon as he, while incarcerated calls his girlfriend and asks: What did they find? Did they find them? And he says that he slid the money right under the mattress in May's room, which is exactly where they found that money. He also says, delete my Facebook.

(Trial Tr. I, ECF No. 10-8, PageID.363.)

During rebuttal arguments, the prosecutor again referenced the calls Petitioner made from jail to his girlfriend "to find out what did they find." (Trial Tr. II, ECF No. 10-9, PageID.679.) He

also referenced Petitioner's testimony regarding his past crimes and guilty pleas thereto. Specifically, the prosecutor argued:

> Now, January 25th, when he calls her and he talks to her again, this is two days after the incident. He's worried Derrion might be being a tattletale. He's worried Derrion might be being a tattletale. And you heard him from the stand; tattletale, that means saying what someone else did. He's worrying Derrion, the person who we know committed the robbery might be being a tattletale.
>
> * * *
>
> You also know that he knew exactly where the money was hidden. Now, he says I talked to Derrion Spivey, and he told me where he hid it. And then for some reason, [Petitioner] on his phone call to his girlfriend says, did they find the money? It's under Argina's bed, right at the foot. That's where I slid it. That's where I hid the money. He says he hid the money. Do you believe he was misquoting Derrion Spivey? Do you believe him, ladies and gentlemen?
>
> He got up here and he testified that he always admits it when he does it, but then he also said well, if you can't prove it, I'm not going to prove [sic] guilty then. So no, he doesn't always plead guilty when he does it, even by his own words.
>
> He says he lied to the police about the prior crimes he committed. He lied to the police about various things. Do you believe him? Do you believe the [Petitioner] when he says these clearly inculpatory statements, that's where I hid the money, the money he admits—is the money he admits was the money that was stolen from Ms. Barker. That's where I hid the money. Do you believe him when he says: I meant Derrion hid the money there? Do you believe that or do you believe what he said at the end of that final call?
>
> At the end of that final call where he says to Lacrisha Strawder, it would have been worth it. It would have been worth it if I could have zoom-zoom. If he could have ran away, if he could have gotten out of there, this whole thing, and this is in February, have been worth it, but he couldn't find anything to wear. Now, that maybe you believe him on. Maybe he did think this whole thing would have been worth it if only he could have gotten away with it, and that's what he's trying to do today, and that's why he got up there and lied to you. That's why he got up there and lied to me.

(*Id.*, PageID.679–682.)

Petitioner raised these assertions of prosecutorial misconduct on direct appeal, and the court of appeals rejected them in a thorough discussion, stating:

[Petitioner] asserts that the prosecutor mischaracterized [Petitioner's] statements made during a telephone call on January 23, 2019, in which [Petitioner] told Strawder to "delete his account." During the telephone call, [Petitioner] and Strawder were discussing the robbery. Strawder informed [Petitioner] that a woman who had been "at the house next door" had posted on Facebook about [Petitioner] asking others to contact her if they knew [Petitioner]. At that point, [Petitioner] instructed Strawder to "delete my page," and Strawder replied, "that's already taken care of." [Petitioner] proceeded to ask Strawder whether she was "able to get any of the money back," and Strawder replied that she was not able to do so. In another call on February 9, 2019, [Petitioner] and Strawder were discussing [Petitioner's] "account" but failed to specify which account they were referring to. Strawder told [Petitioner] that it was no longer possible to view the picture associated with [Petitioner's] "profile." [Petitioner] then replied that "she probably got messages . . . but you can't even prove that that's my messages." Immediately after [Petitioner] stated as such, Strawder told [Petitioner] that the police asked her whether [Petitioner] had a Facebook page.

[Petitioner's] telephone conversations with Strawder gave rise to a reasonable inference that [Petitioner's] request to delete his Facebook page amounted to an acknowledgment of guilt. At the time [Petitioner] initially asked Strawder to delete his account, [Petitioner] and Strawder were discussing the details of the robbery. Although it is somewhat unclear, it appears that Strawder informed [Petitioner] that Barker had posted about [Petitioner] on Facebook asking others to provide information about [Petitioner]. During the February 9, 2019 telephone call, [Petitioner] and Strawder were discussing an unspecified "account" that Strawder had deleted for [Petitioner]. [Petitioner] stated that, because the account was deleted, it was no longer possible to view messages that had been sent from the account. Immediately after [Petitioner] made this comment, Strawder told [Petitioner] that the police had asked about [Petitioner's] Facebook profile. These circumstances gave rise to a reasonable inference that [Petitioner] was attempting to conceal evidence of the robbery that was contained on his Facebook account. [Petitioner] and Strawder discussed incriminating messages and brought up Facebook at several points during their conversations. Moreover, Sergeant Braddock testified that he was unable to investigate [Petitioner's] Facebook account because it had been deleted. Therefore, the prosecutor argued a reasonable inference from the evidence to support his theory of the case such that the prosecutor did not engage in prosecutorial misconduct.

[Petitioner] asserts that there was no contextual basis to support the prosecutor's assertion that [Petitioner] was referring to the robbery when he told Strawder that "it would have been worth it if I could have zoom zoom." During a telephone call on February 9, 2019, [Petitioner] and Strawder were discussing his arrest as well as other topics. Strawder told [Petitioner] that the situation irritated her, and [Petitioner] replied as follows: "It would have been worth it if we could have zoom zoom . . . I couldn't get out the house, couldn't find no clothes." [Petitioner] then stated that "all she want is her shit back." When considered in context, [Petitioner] appeared to be discussing the robbery when he stated that it would have been worth

it if he was able to "zoom zoom." [Petitioner] and Strawder had been discussing the robbery throughout their telephone conversation. Additionally, [Petitioner] indicated that he was unable to find clothes and leave his house. At trial, the prosecution presented evidence that the police arrived at [Petitioner's] home shortly after the robbery occurred and found that [Petitioner] was not wearing clothes when he answered his door. Given these circumstances, the prosecutor argued a reasonable inference from the evidence to support his theory of the case such that the prosecutor did not engage in prosecutorial misconduct.

* * *

"The prosecution is permitted to comment on and draw inferences from the testimony of a witness, including a criminal defendant, and may argue that the witness is not worthy of belief." *People v. Pegenau*, 447 Mich. 278, 299; 523 N.W.2d 325 (1994) (citation omitted). During trial, defense counsel introduced evidence of [Petitioner's] prior convictions and the fact that defendant pleaded guilty to those charges. [Petitioner] stated that he pleaded guilty because he actually committed the crimes. Defense counsel then emphasized that the instant matter proceeded to trial, and [Petitioner] stated that he had no involvement in the robbery. On cross-examination, [Petitioner] stated that "I have pled [sic] guilty to all my crimes that I've committed . . . I didn't fight them. I didn't take them to trial." The implication of [Petitioner's] testimony regarding his prior guilty pleas was that [Petitioner] pleads guilty when he actually commits a crime, and, because [Petitioner] declined to plead guilty in the instant matter, [Petitioner] must not have committed the robbery. The prosecutor properly drew this inference from [Petitioner's] testimony and commented that [Petitioner's] theory was not worthy of belief given the evidence of [Petitioner's] guilt. Accordingly, the prosecution did not mischaracterize [Petitioner's] testimony and did not engage in prosecutorial misconduct in this regard.

*Bearden*, 2021 WL 2494007, at *6–7.

The court of appeals' analysis tracks applications of clearly established federal law. "[T]he government may not rely on prejudicial facts not in evidence when making its closing arguments." *United States v. Roach*, 502 F.3d 425, 434 (6th Cir. 2007). Nonetheless, "[a] prosecutor has 'leeway to argue reasonable inferences from the evidence' during closing arguments." *United States v. Crosgrove*, 637 F.3d 646, 664 (6th Cir. 2011) (quoting *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000)).

Petitioner offers nothing to indicate that the court of appeals strayed from clearly established federal law in rejecting this assertion of prosecutorial misconduct. Petitioner merely

vaguely insists that the prosecutor misrepresented the record. Such a conclusory allegation is insufficient to justify federal habeas relief. *See Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998) (noting that conclusory allegations of ineffective assistance of counsel do not justify habeas relief); *see also Wogenstahl v. Mitchell*, 668 F.3d 307, 335–36 (6th Cir. 2012) (citing *Workman* and affirming the denial of habeas relief for conclusory claims). The testimony relied upon by the court of appeals supports the prosecutor's comments during opening statements and closing arguments. Certainly, under the circumstances, Petitioner has not demonstrated that the prosecutor's comments "so infected the trial with unfairness" that he was denied due process.

### 3.    Summary

Petitioner's conclusory assertions of prosecutorial misconduct simply fail to demonstrate that the court of appeals' rejection of these claims was contrary to, or an unreasonable application of, clearly established federal law. Accordingly, Petitioner is not entitled to relief with respect to habeas grounds II and III.

### B.    Grounds I and IV—Ineffective Assistance of Counsel

Petitioner raises several assertions of ineffective assistance of trial counsel in habeas grounds I and IV. In habeas ground I, Petitioner appears to fault counsel for allowing the victims to identify Petitioner in court. (Pet., ECF No. 1, PageID.5.) Petitioner also faults trial counsel for not investigating or preparing "to properly cross[-]examine a witness who had made conflicting statements." (*Id.*) Petitioner also suggests that counsel "did not put any evidence on the record that was given to help [Petitioner]." (*Id.*) In habeas ground IV, Petitioner contends that trial counsel failed to get an expert witness regarding identifications and failed to use evidence that helped Petitioner, especially evidence that Barker had previously stated that Petitioner was not the individual in the picture on Facebook. (*Id.*, PageID.10.)

14

### 1.      Standard of Review

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the petitioner resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the petitioner is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013); *Cullen*, 563 U.S. at 190; *Premo v. Moore*, 562 U.S. 115, 122 (2011). Scrutiny of counsel's performance is "highly deferential", per *Strickland*, to avoid the temptation to second guess a strategy after-the-fact and to "eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. And then scrutiny of the state court's scrutiny of counsel's performance must also be deferential, per 28 U.S.C. § 2254(d). In light of

that double deference, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740–41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . ." (citing *Harrington*, 562 U.S. at 102)).

Petitioner raised his claims of ineffective assistance on direct appeal, and the court of appeals addressed them under the following standard:

> A defendant seeking relief based upon a claim of ineffective assistance of counsel bears the burden of showing "(1) that trial counsel's performance was objectively deficient, and (2) that the deficiencies prejudiced the defendant." *People v. Randolph*, 502 Mich. 1, 9; 917 N.W.2d 249 (2018) (citation omitted). "A counsel's performance was deficient if it fell below an objective standard of professional reasonableness. The performance prejudiced the defense if it is reasonably probable that, but for counsel's error, the result of the proceeding would have been different." *People v. Fyda*, 288 Mich. App. 446, 450; 793 N.W.2d 712 (2010). There is a strong presumption that counsel's conduct fell within a wide range of professional assistance. *People v. LeBlanc*, 465 Mich. 575, 578; 640 N.W.2d 246 (2002). Thus, defendant must overcome the strong presumption that the challenged action might be considered sound trial strategy. *Id.*

*Bearden*, 2021 WL 2494007, at *8. In *Randolph*, the Michigan Supreme Court identified *Strickland* as the source of the standard. *See Randolph*, 917 N.W.2d at 252. Thus, there is no question here that the court of appeals applied the correct standard.

The state court's application of the correct standard eliminates the possibility that the resulting decision is "contrary to" clearly established federal law. As the Supreme Court stated in *Williams v. Taylor*:

> The word "contrary" is commonly understood to mean "diametrically different," "opposite in character or nature," or "mutually opposed." Webster's Third New International Dictionary 495 (1976). The text of § 2254(d)(1) therefore suggests that the state court's decision must be substantially different from the relevant precedent of this Court. The Fourth Circuit's interpretation of the "contrary to" clause accurately reflects this textual meaning. A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.

*Williams*, 529 U.S. at 405. The Court went on to offer, as an example of something that is not "contrary to" clearly established federal law, the following:

> [A] run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s "contrary to" clause. Assume, for example, that a state-court decision on a prisoner's ineffective-assistance claim correctly identifies *Strickland* as the controlling legal authority and, applying that framework, rejects the prisoner's claim. Quite clearly, the state-court decision would be in accord with our decision in *Strickland* as to the legal prerequisites for establishing an ineffective-assistance claim, even assuming the federal court considering the prisoner's habeas application might reach a different result applying the *Strickland* framework itself. It is difficult, however, to describe such a run-of-the-mill state-court decision as "diametrically different" from, "opposite in character or nature" from, or "mutually opposed" to *Strickland*, our clearly established precedent. Although the state-court decision may be contrary to the federal court's conception of how *Strickland* ought to be applied in that particular case, the decision is not "mutually opposed" to *Strickland* itself.

*Id.* at 406. Therefore, Petitioner can only overcome the deference afforded state court decisions if the court of appeals' determinations were based on an unreasonable application of *Strickland* or if the court of appeals' resolutions were based on unreasonable determinations of the facts. 28 U.S.C. 2254(d).

### a.      Identifications

In habeas ground I, Petitioner mentions that "witnesses made multiple statements, and were allowed to ID me in court." (Pet., ECF No. 1, PageID.5.) Because Petitioner mentions this under his first ineffective assistance ground, the Court construes Petitioner to assert that counsel was ineffective for allowing the victims to identify Petitioner in court.

On direct appeal, the court of appeals concluded that the in-court identifications of Petitioner were permissible because there was "clear and convincing evidence that an independent basis for the in-court identifications existed." *Bearden*, 2021 WL 2494007, at *5. The court of appeals discussed such evidence in a thorough opinion, and Petitioner offers nothing to refute the court of appeals' conclusions. Given the court of appeals' determination that the in-court

identifications were permissible, it would have been futile for trial counsel to object. "No prejudice flows from the failure to raise a meritless claim." *Mahdi v. Bagley*, 522 F.3d 631, 638 (6th Cir. 2008); *see also Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013) (stating that "[o]mitting meritless arguments is neither professionally unreasonable nor prejudicial").

**b.    Expert Testimony**

Next, Petitioner faults trial counsel for failing to introduce expert witness testimony regarding identifications. (Pet., ECF No. 1, PageID.10.) Petitioner raised this claim on direct appeal, and the court of appeals rejected it, stating:

> A decision regarding whether to present expert testimony is presumed to be a permissible exercise of trial strategy. *People v. Cooper*, 236 Mich. App. 643, 658; 601 N.W.2d 409 (1999). [Petitioner] has failed to overcome the presumption in this matter. During trial, defense counsel cross-examined Barker and Williams regarding their identifications of [Petitioner]. In doing so, defense counsel emphasized discrepancies in the victims' accounts of the robbery, discrepancies in the victims' descriptions of [Petitioner], and the fact that Barker and Williams identified [Petitioner] while they were together such that they may have influenced one another. Thus, [Petitioner] chose a reasonable trial strategy in cross-examining the prosecution's witnesses to undermine their identifications of [Petitioner] without need to resort to an expert witness.
>
> Even assuming that defense counsel's performance fell below an objective standard of professional reasonableness when defense counsel failed to present expert testimony, [Petitioner] has failed to establish that the result of the proceeding would have been different if an expert had testified. As previously addressed, there was an independent basis for Barker and Williams to identify [Petitioner] in the courtroom. Thus, even if an expert could have persuaded the jury to disregard the victim's identification of [Petitioner] on the date of the robbery, the victims would still have identified [Petitioner] in the courtroom.

*Bearden*, 2021 WL 2494007, at *9–10.

The court of appeals' determination tracks with clearly established federal law. The Supreme Court has recognized that "[t]he selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after a thorough investigation of [the] law and facts,' is 'virtually unchallengeable.'" *Hinton v. Alabama*, 571 U.S. 263, 275 (2014) (quoting

18

*Strickland*, 466 U.S. at 690). Here, there is no record evidence suggesting that Petitioner's counsel did not investigate the possibility of obtaining expert testimony regarding identifications and their reliability. Absent such support, Petitioner cannot overcome the presumption that counsel's actions fell within "the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

In any event, Petitioner fails to offer support for his belief that an expert existed who was willing to testify and whose testimony would have been favorable to Petitioner's defense. Without some record support for Petitioner's contention, it is impossible for Petitioner to show that his counsel was professionally unreasonable for failing to pursue such expert testimony or that it made any difference in the result. "A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." *United States v. Ashimi*, 932 F.2d 643, 650 (6th Cir. 1991) (footnote omitted); *see also Lagrone v. Parris*, No. 23-5177, 2023 WL 5623279, at *4 (6th Cir. Aug. 7, 2023) ("Lagrone did not identify an expert his trial counsel could have called or indicate what an expert could have testified that would have been relevant to his defense. The speculative impact of expert testimony is not enough to prove prejudice under *Strickland*."); *Pillette v. Berghuis*, 408 F. App'x 873, 887 (6th Cir. 2010) (stating that "[t]he salient point is that nobody knows what she would have said. Speculation cannot suffice to establish the requisite prejudice.").

Furthermore, the court of appeals noted that the victims' in-court identifications of Petitioner were admissible. *See Bearden*, 2021 WL 2494007, at *4–5. Petitioner does not challenge that conclusion in his habeas petition. Given the fact that the in-court identifications of Petitioner were admissible, Petitioner has not demonstrated that any expert testimony regarding the reliability of out-of-court identifications would have changed the result of his trial in any way. Because Petitioner has not demonstrated that the court of appeals' conclusion was contrary to, or an

unreasonable application of, *Strickland*, he is not entitled to habeas relief with respect to this assertion of ineffective assistance.

### c.    Use of Evidence and Cross-Examination of Witnesses

Finally, Petitioner faults counsel for not fully investigating or preparing "to properly cross[-]examine a witness who had made conflicting statements." (Pet., ECF No. 1, PageID.5.) Petitioner also suggests that counsel "did not put any evidence on the record that was given to help [Petitioner]." (*Id.*) In habeas ground IV, Petitioner vaguely suggests that counsel failed to introduce evidence that Barker had previously stated that Petitioner was not the individual in the picture on Facebook. (*Id.*, PageID.10.)

On direct appeal, Petitioner argued that trial counsel was ineffective for not impeaching Barker and Williams "with prior inconsistent testimony regarding their immediate recognition of [Petitioner] as the individual in the photograph associated with Geno Beatden's Facebook account." *Bearden*, 2021 WL 2494007, at *9. The court of appeals disagreed with Petitioner, stating:

> Although [Petitioner] asserts that Barker and Williams did not immediately recognize [Petitioner] as the individual in the photograph associated with Geno Beatden's Facebook account, [Petitioner] fails to identify any evidence of record supporting his assertion. Instead, [Petitioner] argues that Barker and Williams misidentified [Petitioner] as Geno Beatden because they originally believed that [Petitioner] was one of the individuals holding a firearm during the robbery. The fact that Barker and Williams originally believed that [Petitioner] was one of the individuals holding a firearm during the robbery bears no relevance to their recognition of [Petitioner] as the individual in the photograph associated with Geno Beatden's Facebook account. Accordingly, defense counsel's performance did not fall below an objective standard of professional reasonableness when defense counsel failed to impeach Barker and Williams regarding their immediate recognition of [Petitioner] as the individual in the photograph associated with Geno Beatden's Facebook account.[2]

---

[2] We note that, since filing his brief on appeal, [Petitioner] has filed a motion to remand with this Court, wherein [Petitioner] has asked this Court to supplement the

record with a recorded interview of and written statements from the victims. [Petitioner] notes that the recorded interview in particular evidences contradictory statements between the victims' beliefs immediately after the incident and during trial. We note that the evidence is not as contradictory as [Petitioner] suggests. While the two victims do appear to indicate in the interview in contradiction to their testimony that the individual with the bandana was not apprehended and identified immediately following the robbery, the interview as a whole is largely corroborative. Moreover, [Petitioner's] counsel had sound reason to avoid bringing further attention to the issue to avoid the jury being further reminded of the extensive evidence that corroborated the victims' trial testimony, including their written statements, police testimony concerning the bandana, and the bandana itself, which was admitted as evidence at trial. We denied [Petitioner's] motion. *People v. Bearden*, unpublished order of the Court of Appeals, entered May 20, 2021 (Docket No. 352303).

*Id.* at *9 and n.2.

To the extent Petitioner faults counsel for not introducing any evidence, other than the suggestion that Barker did not recognize Petitioner as the individual in the Facebook photo, he fails to elaborate upon his vague assertion by describing what evidence he believes counsel should have introduced. Such a conclusory allegation is simply insufficient to justify federal habeas relief. *See Workman*, 178 F.3d at 771; *see also Wogenstahl*, 668 F.3d at 335–36.

Furthermore, the record does not support Petitioner's assertion that Barker and Williams did not immediately recognize Petitioner as the individual in the Facebook photo associated with Geno Beatden's profile. During direct, Williams testified that when they arrived at the given address, they recognized an individual who matched the Facebook photo. (Trial Tr. I, ECF No. 10-8, PageID.378.) When asked if that individual was in the courtroom, Williams identified the individual as Petitioner. (*Id.*, PageID.379.) Williams testified that he "absolutely" recognized Petitioner "from the Facebook profile." (*Id.*)

Barker testified similarly to Williams. Barker stated that prior to going to the given address, she scrolled through the Facebook profile associated with Geno Beatden to determine whether he was a real person. (*Id.*, PageID.454–455.) When she and Williams arrived at the address, Barker

21

saw someone who looked like the individual from the Facebook photos. (*Id.*, PageID.455.) Barker noted that individual introduced himself as Geno Beatden and was the one who answered the door. (*Id.*) When asked if that individual was in the courtroom, Barker identified Petitioner. (*Id.*)

Given Williams and Barker's testimony, there was no basis for Petitioner's counsel to assert a challenge that they had not recognized Petitioner as the individual from the Facebook account. Moreover, as discussed *supra*, counsel thoroughly cross-examined both Williams and Barker about the discrepancies between their prior statements to law enforcement and their testimony given at trial. The fact that counsel's strategy—to impeach the victims with their prior statements—was unsuccessful does not mean that counsel's pursuit of it was professionally unreasonable. The court of appeals concluded that counsel's performance during his cross-examination of Barker and Williams "did not fall below an objective standard of professional reasonableness." *Bearden*, 2021 WL 2494007, at *9. This Court agrees. Because Petitioner has not demonstrated that the court of appeals' rejection of this assertion of ineffective assistance of counsel is contrary to, or an unreasonable application of, *Strickland*, Petitioner is not entitled to federal habeas relief with respect to this claim.

### d.        Summary

Here, Petitioner's conclusory assertions of ineffective assistance of counsel simply fail to demonstrate that the court of appeals' rejection of this claim was contrary to, or an unreasonable application of, *Strickland*. Accordingly, Petitioner is not entitled to relief with respect to habeas grounds I and IV.

## IV.    Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## **Conclusion**

The Court will enter a judgment denying the petition and an order denying a certificate of appealability.

Dated:   May 16, 2024                     /s/ Hala Y. Jarbou
                                          HALA Y. JARBOU
                                          CHIEF UNITED STATES DISTRICT JUDGE